UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Katherine Cockman, On Behalf of Herself
and All Others Similarly Situated,

       Plaintiff,

 v.

Assignment Desk Works LLC, Patrick
Bryant, and Shawn Moffatt,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:19-cv-3082-BHH

**Opinion and Order**

  This matter is before the Court on various motions, including: Plaintiff's Motion for Conditional Class Certification (ECF No. 18); Defendants' Motion for Relief from Mediation (ECF No. 24); Defendant's Motion for Summary Judgment as to Patrick Bryant (ECF No. 27); Defendants' Motion for Summary Judgment (ECF No. 29); Plaintiffs' Motion for Summary Judgment (ECF Nos. 33), and Defendants' Motion to Strike and/or Deny Plaintiffs' Motion for Partial Summary Judgment and/or Award Sanctions to the Defendants (ECF No. 34). For the following reasons: Plaintiff's Motion for Conditional Class Certification (ECF No. 18) is granted; Defendants' Motion for Relief from Mediation (ECF No. 24) is denied as moot; Defendant's Motion for Summary Judgment as to Patrick Bryant (ECF No. 27) is granted; Defendants' Motion for Summary Judgment (ECF No. 29) is denied; Plaintiffs' Motion for Summary Judgment (ECF No. 33) is granted in part and denied in part; and Defendants' Motion to Strike and/or Deny Plaintiffs' Motion for Partial Summary Judgment and/or Award Sanctions to the Defendants (ECF No. 34) is

denied.

## BACKGROUND

In this action, Plaintiff Katherine Cockman ("Cockman"), on behalf of herself and all others similarly situated, seeks recovery for alleged violations of the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). Additionally, Cockman asserts individual causes of action for retaliation under the FLSA and for breach of contract.

In 1997, Defendant Patrick Bryant ("Bryant") along with a business partner started a company called Go to Team ("GTT"). GTT provides broadcast television services to networks and other producers of television and video production. GTT has a staff of cameramen and other production specialists. Bryant hired Defendant Shawn Moffatt ("Moffatt") to work at GTT in 2006.

In 2013, Bryant and Moffatt purchased Assignment Desk Works LLC ("ADW"), which was a customer of GTT. ADW outsourced some of their video production to GTT staff and crews. When Bryant and Moffatt purchased ADW, they retained the Production Coordinators ("PCs") who were employed by the former owner. Bryant testified that other than adding new roles at the company, ADW's business model is the same as when he and Moffatt purchased it. (Bryant Dep. 35:14–24, ECF No. 33-1.) Bryant owns 90 percent of ADW stock and is Chairman of the Board; Moffatt is Managing Partner of both GTT and ADW.

ADW is a "middleman" in the video production industry. The company provides a service for video production crews and clients. ADW clients range from news, sports, and entertainment organizations to large corporations. ADW books freelance production

crews for video shoots and charges a percentage to both the crews and the clients for this service. Moffat testified, "You have clients on one side. You have crews on another. [ADW is] in the middle, as a broker. And we mark up to the client and we mark down to the crew." (Moffat Dep. 5:12–15, ECF No. 33-2.) Moffat further testified that the average markup is 22%; however, the best-case scenario is a 30% markup, with a 15% markup to both crews and clients respectively. (*Id.* 5:16–6:1.) ADW's Employee Manual outlines a 15% markup on each side of the deal. (ECF No. 33-3 at 3.)

ADW and GTT are closely related business entities. The businesses share office space, the same controller, an accounting firm, and some employees. The distinction between them is that ADW books freelance crews, while GTT books crew members that are on its staff. (Moffatt Dep. 17:22–18:1.) Approximately 6% of shoots booked through ADW are covered by GTT crews. (*Id.* 18:4–6.) ADW and GTT have the same management staff. The organizational chart that Defendants submitted pertains to both companies. (ECF No. 33-4.) Bryant is at the top of the organizational chart for both GTT and ADW as President. (*Id.*) Moffatt is below him with the title Managing Partner for both companies. (*Id.*) Courtney Crosby is directly below Moffatt with the title of Operations Manager. (*Id.*) Moffat testified that Ms. Crosby is responsible for running high-level documents and reports, looking at specific clients, specific crews, potential clients, and revenue streams; she also reaches out to clients on the phone and handles marketing. (Moffatt Dep. 21:7–15.) Erin Gunther who is the Production Manager, falls underneath Ms. Crosby. (ECF No. 33-4.) According to Moffatt, Ms. Gunther focuses on sales and big projects like the Super Bowl. (Moffatt Dep. 23:5–25.) Robin Morton is also a Production Manager even though her name and title are not on the organizational chart. Moffatt

testified Ms. Morton supervises the PCs. (*Id.* 24:20–25). The PCs are the lowest level employees with the exceptions of interns and PC assistants. (*Id.* 30:4–24.) However, the PC assistant and intern positions are often vacant. (*Id.*) The PCs do not have the authority to hire or fire employees (*Id.* 31:3–7.)

The PCs work directly with ADW's clients. Their primary job duty is to book the shoots that generate revenue for ADW. (*Id.* 35:15–20.) Moffatt described the PCs job duties in the following way: "[T]hey're taking the call, they're dealing with the client, potentially from the very beginning, and they're in front of that client, managing that shoot, managing that crew that they found, that they hired, that they chose for that shoot. And they're . . . on the front lines. . . . They manage the shoot day to day and are directly affecting the business." (*Id.* 33:9–22.) ADW has hundreds of clients with about 50 to 75 that provide ADW with significant volume. The Employee Manual states, "Each [PC] is equally the first contact for all crewed shoots, booked positions and other services. Any [PC] can work with any client at any time. Clients are not exclusive to [PCs]." (ECF No. 33-3 at 2.)

The Employee Manual is relatively detailed, setting forth how staff should answer the phone, the parameters that apply to ADW's 24-hour availability, the process of hiring vendors, how to make company calendar entries, the process of booking a shoot, pricing, invoicing and billing, customer service strategies, and more. (*See* ECF No. 33-3.) It further sets forth various instances where PCs are required to get approval from the "Production Manager, General Manager and/or Managing Partner" before taking certain actions. (*Id.*) For example, approval is required if a vender suggests changes to the ADW Independent Contactor Agreement, or to give a customer a discount in the case of client dissatisfaction.

4

(*See id.* at 2, 4.) PCs are required to use ADW standard forms, and get them signed, when booking a shoot or dealing with a new client. (*See id.* at 3; Moffatt Dep. 79:20–25.) The Employee Manual specifies the range within which PCs can negotiate rates:

> Assignment Desk shall require the crews to reduce their normal rate by 15% and markup the predesignated rate by at least 15%. This insures a 30% profit margin on all shoots and positions. PCs can negotiate rates with both the Vender and the Client. The goal is to book the shoot. So if you have to reduce profit margin to book the shoot, as long as you're not at break even or negative, then the shoot is profitable and it should be booked. Any further discounts or negotiated rates should involve the Production Manager and/or Managing Partner.

(ECF No. 33-3 at 3.) The Production Manager, General Manager and/or Managing Partner review all invoices generated by PCs using QuickBooks. (*Id.*) Moffatt testified that when PCs negotiate rates, they are working from guidelines pre-filled in QuickBooks by ADW management, which guideline rates ebb and flow with current rates in the industry given the applicable conditions. (Moffatt Dep. 60:5–61:21.) For instance, guideline rates for a makeup artist, cameraman, audio person, director of photography, and grip are auto filled for the PCs in QuickBooks. (*Id.* 61:22–62:15.) Moffatt stated he and his Operations Manager, Ms. Crosby, establish these guidelines by reviewing reports in QuickBooks and looking at average rates for a particular position that ADW has charged in the past. (*Id.* 63:3–17.)

The PCs are paid a starting salary of $28,500.00. (Employment Contract, ECF No. 33-5.) The Employment Contract specifies a two-year term of employment and contains penalties if a PC breaches the agreement. (*Id.* at 1, 4–5.) The penalty for early termination of the contract by a PC is two months' wages. (*Id.* at 4.) PCs have a set schedule of 9:00 a.m. to 6:00 p.m. with a one-hour lunch on weekdays. (Moffatt Dep. 96:21–25.) After the first 2 to 3 months, PCs are required to be on-call during evenings and weekends. (*Id.*

5

83:4–25, 93:88–10.) The Employment Contract does not include the fact that PCs are required to be on-call. (*See* ECF No. 33-5.) Moffatt testified that ADW works globally and is a "24/7 operation;" therefore, the PCs are expected to respond to calls, emails, and voicemails seeking to book video shoots 7-days-a-week and 24-hours-a-day for a week at a time. (Moffatt Dep. 83:18–22, 84:3–25, 88:22–25, 90:1–18.) Ms. Morton creates the on-call schedule for the PCs. (*Id.* 25:13–24.) The PCs are not paid additional compensation for the hours they spend working when they are on-call. (*Id.* 95:23–25.) ADW does not keep records or track the hours the PCs spend working on-call. (*Id.* 94:2–15.)

Moffatt testified he is aware the PCs work more than 40 hours a week when they are on-call. (*Id.* 94:4–25.) He further testified that he did not consult with an attorney about whether the PCs' compensation plan complied with the FLSA. (*Id.* 156:9–12.) Moffat did, however, consult with an attorney about whether GTT video crews' compensation was FLSA compliant, specifically regarding overtime pay for GTT cameramen. Moffatt stated that he independently researched whether ADW was required to pay PCs overtime by consulting the U.S. Department of Labor website, ultimately determining, based on his interpretation of the standards that PCs were exempt employees. (*See id.* 97:24–98:25.)

Cockman was employed by ADW as a PC from November 7, 2016 through August 6, 2019. She was classified as an exempt employee and was not paid overtime. Cockman testified that to make up for the extra hours PCs worked while on call, ADW instituted a policy allowing PCs to come to the office at noon Monday through Friday of the workweek following their on-call week. (Cockman Dep. 25:10–22; ECF No. 29-2.) She stated this policy was instituted because the PCs were "all complaining about how overworked we

were." (*Id.* 25:23–26:1.) Pursuant to the Employment Contract, Cockman's starting salary with ADW was $28,500.00 annually, or $548.08 per week. In February 2017, Cockman negotiated a raise plus three additional days of vacation. After that point, she continued to work on a salary basis with the on-call schedule. (*Id.* 123:9–24.) Cockman entered into a second contract with ADW after her initial two-year term was complete, with a new salary of $35,000.00 annually, or $673.09 per week. (Ex. 1, Cockman Dep., ECF No. 29-3.)

Cockman's employment with ADW was ultimately terminated. Prior to her termination, Cockman received two reprimands. The first reprimand was a verbal warning given by Moffat, Ms. Gunther, and Ms. Crosby on September 19, 2017, for failing to show up for work on September 18, 2017. (*See* Pls.' Answer to Interrogs., ECF No. 29-6 at 2–3.) On May 28, 2019, Cockman received another verbal warning from Ms. Gunther and Ms. Crosby after Cockman failed to take calls during her on-call rotation on May 27, 2019, because she was "out on a boat drinking all day" and "not in the position to work." (*Id.* at 3.) Cockman contends that May 27, 2019 was Memorial Day and a paid vacation day according to Defendants' vacation policy. (*Id.*) Cockman was eventually terminated after a third reprimand for not taking client calls or otherwise getting coverage for times when she was assigned the on-call duty. (Cockman Dep. 183:4–25, 187:2–18.) Cockman had arranged to have Ms. Morton, a Production Manager, cover some of her on-call hours over the weekend of August 3–4, 2019. (ECF No. 29-6 at 3–4.) Cockman asserts that she was supposed to let Ms. Morton know when she was ready to take her shift back on August 4, but her phone died and she had no way of getting ahold of Ms. Morton. (*Id.* at 4.) Cockman further asserts that she was "downtown with her friends all day" on August

4, that she called in on Monday, August 5 to state that she was not feeling well and needed to take sick day, and that when she reported back to work on Tuesday, August 6, she was terminated. (*Id.*)

## LEGAL STANDARD

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine

issue has been raised, the Court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. "Genuineness" of the disputed issue(s) "means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### A. Plaintiff's Motion for Conditional Class Certification

The FLSA's "collective action" provision allows one or more employees to bring an action for overtime compensation "for and in behalf of [her]self or themselves and other employees who are similarly situated." 29 U.S.C. § 216(b); *Hoffman-Laroche v. Sperling*, 493 U.S. 165, 170 (1989). In a FLSA collective action, those employees who wish to participate must affirmatively "opt in" by giving written consent to join in the action as a party. *Shaffer v. Farm Fresh*, 966 F.2d 142, 144 (4th Cir. 1992); *Bernard v. Household Int'l Inc.*, 231 F. Supp. 2d 433, 435 (E.D. Va. 2002). Federal courts apply a two-step analysis in determining whether plaintiffs are "similarly situated," rendering the case suitable as a collective action. *Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 562 (E.D. Va. 2006). First, during the "notice stage," courts determine "whether to provide

initial notice of the action to potential class members." *Id.* The standard for determining whether the potential plaintiffs are "similarly situated" at this stage is a "fairly lenient" one. *Id.* "In general, courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan [that violated the FLSA]." *LaFleur v. Dollar Tree Stores, Inc.*, No. 2:12-CV-00363, 2012 WL 4739534, at *3 (E.D. Va. Oct. 2, 2012) (internal citation and quotation marks omitted). During this initial "notice stage," the trial court has the authority to authorize the contents of a notice that plaintiffs' counsel may send to potential plaintiffs and to facilitate the sending of this notice by ordering discovery of the names and addresses of potential plaintiffs. *See Hoffman-Laroche*, 493 U.S. at 170 ("Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure."). Providing notice to potential plaintiffs in a collective action is essential to serving the broad remedial purpose of the FLSA. Once the court makes a preliminary determination that the potential plaintiffs are similarly situated, the case proceeds as a collective action throughout discovery. *Johnson v. TGF Precision Haircutters, Inc.*, 319 F. Supp. 2d. 753, 755 (S.D. Tx. 2004). Thereafter, discovery is relevant both as to the merits of the case and for the second step in the collective action procedure.

> The court proceeds to stage two if the defendant files a motion for decertification, usually after discovery is virtually complete. Accordingly, throughout the second stage, courts apply a heightened fact specific standard to the "similarly situated" analysis. Upon a determination that the plaintiffs establish the burden of proving they are "similarly situated", the collective action proceeds to trial. On the contrary, if the court determines

that the plaintiffs are in fact, not "similarly situated", the class is decertified and the original plaintiffs proceed on their individual claims.

*Choimbol*, 475 F. Supp. 2d at 563.

The Court finds that Plaintiffs have met the required showing for conditional certification of a collective action. Defendants do not contest that all PCs at ADW were subject to the same overtime pay policy and that all PCs were classified as "exempt." Nor do Defendants contest that PCs were required to be "on call" after work hours and on weekends, and that PCs regularly worked more than 40 hours per week without overtime compensation. The merits of this action center upon whether Defendants' classification of PCs as exempt from overtime pay was unlawful under the FLSA. Thus, the uncontested facts establish that PCs were "similarly situated" for purposes of a FLSA collective action.

Rather than contesting the unavoidable conclusion that PCs were similarly situated, Defendants oppose conditional certification by arguing that the Motion was untimely. (ECF No. 19.) Plaintiff Cockman filed this action on October 30, 2019, alleging, *inter alia*, violations of the overtime provisions of the FLSA. (ECF No. 1.) Plaintiff Cockman consented to a 21-day extension of time to file responsive pleadings and, on December 9, 2019, Defendants timely filed their Answer denying any wrongdoing and asserting that Plaintiff, and all other similarly situated employees, were exempt employees under the FLSA. (ECF No. 7.) On January 14, 2020, the Court issued a Conference and Scheduling Order, which stated that motions to join parties were due March 11, 2020. (ECF No. 12.) On February 6, 2020, through counsel, Plaintiff Berg filed notice of her written consent to join this action. (ECF No. 16.) On February 7, 2020, counsel for the parties conducted a Rule 26(f) conference, during which conference the parties agreed that the schedule set forth in the January 14, 2020 Conference and Scheduling Order was appropriate for this

case. (ECF No. 17.) Also during the Rule 26(f) conference, Plaintiffs' counsel informed Defendants' counsel that she intended to file a Motion for Conditional Class Certification. (Dukes Aff., ECF No. 19-1.) Plaintiff Cockman filed her Motion for Conditional Class Certification on April 22, 2020, approximately six weeks after the applicable deadline, without having obtained the consent of opposing counsel or moving the Court for an extension of time. (ECF No. 18.) The Motion seeks the Court's permission to mail a proposed Notice (ECF No. 18-2) to the following group: *All current and former Assignment Desk Production Coordinators who were not paid overtime wages for all hours worked in excess of forty (40) hours per work week from [three years from the date of the Court's Conditional Certification Order] to the present*. (ECF No. 18-1 at 2.)

The Court declines to exercise its authority to deny the Motion for Conditional Class Certification merely because it was filed after the joinder deadline set forth in the then applicable scheduling order. To be sure, "a court's scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril," and "a movant must demonstrate that the reasons for the tardiness of [her] motion justify a departure from the rules set by the court in its scheduling order." *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) (internal citations and quotation marks omitted). Nevertheless, the Court notes that the complicating realities of the COVID-19 pandemic were just materializing in late February and early March 2020, during the same time frame that the deadline to move to join parties expired in this case. These events were unusual, unprecedented, and enormously disruptive to the practice of law in every jurisdiction. Plaintiffs' counsel has indicated that she closed her office and allowed her staff to work from home, which contributed to delays in completing the Motion. (*See* ECF No. 20 at 6.)

Accordingly, the Court finds that some latitude is appropriate under the circumstances and denial of the Motion for a procedural reason unrelated to its merits would be an unduly harsh sanction. Moreover, given that significant time remained prior to the expiration of the discovery deadline and that Defendants cannot point to any unfair prejudice resulting from the delayed filing of the Motion, the interests of judicial economy will be served by addressing Plaintiffs' claims in the context of a collective action. *See Galvan v. DNV GL USA, Inc.*, No. 4:17-CV-1543, 2018 WL 2317711, at *2 (S.D. Tex. May 22, 2018) (acknowledging the untimeliness of plaintiff's motion for conditional class certification but considering it anyway "because the parties have not completed discovery, judicial economy weighs in favor of the collective action instead of having potential opt-ins filing their own actions, and the Defendant will not suffer any real prejudice from a short continuance of the . . . deadlines in the scheduling order"). Therefore, the Court grants Plaintiff's Motion for Conditional Class Certification and hereby: (1) authorizes this matter to proceed as a collective action; (2) authorizes mailing of the proposed Notice (ECF No. 18-2) to all PCs who were employed by Defendants during the time period commencing three years prior to the entry of this Order; and (3) requires Defendants to produce a list containing the names and addresses of all potential opt-in plaintiffs so that these potential parties can receive notice of this action.

## B. Defendant's Motion for Summary Judgment as to Patrick Bryant

Defendant Bryant filed an individual motion for summary judgment seeking a ruling that he was not Plaintiffs' "employer" under the FLSA. (ECF No. 27.) The "FLSA conditions liability on the existence of an employer-employee relationship, and the employee bears the burden of alleging and proving the existence of that relationship."

*Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) (citing *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999)). Moreover, the FLSA defines "employer" as "'any person acting directly or indirectly in the interest of an employer in relation to an employee . . . .'" *Benshoff*, 180 F.3d at 140 (quoting 29 U.S.C. § 203(d)). In the Fourth Circuit, a district court employs the "economic reality" test to determine whether an individual is an "employer" for purposes of the FLSA, which requires consideration of the following relevant factors: "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Kerr*, 824 F.3d at 83 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). "No single factor is dispositive; rather, a court must consider the totality of the circumstances." *Perez v. Ocean View Seafood Rest., Inc.*, 217 F. Supp. 3d 868, 877 (D.S.C. 2016) (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)). Ultimately, the Court must determine "whether the individual has sufficient operational control over the workers in question and the allegedly violative actions to be held liable for unpaid wages or other damages." *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 720 (E.D.N.C. 2009) (citation and quotation marks omitted).

"[I]ndividuals ordinarily are shielded from personal liability when they do business in a corporate form, and it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA." *Gray v. Powers*, 673 F.3d 352, 356 (5th Cir. 2012) (citation, quotation marks, and modification omitted). Accordingly, an inference of control based merely on an individual's status as a business owner will not suffice to

create a genuine issue of fact as to whether the individual is an "employer" under the FLSA. *Id.* "To be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986).

The evidence is clear that Bryant was not involved in the daily operations of ADW. He did not hire or fire ADW employees, control employee work schedules, or determine employee rates of pay. (Bryant Decl. ¶ 7, ECF No. 27-3.) Rather, at all relevant times Moffatt was the managing partner of ADW and retained sole authority over employee matters. (Moffatt Decl. ¶ 3, ECF No. 27-2.) Plaintiffs have not produced material evidence to demonstrate otherwise. Plaintiffs note that Bryant is at the top of ADW's organizational chart as president, chairman of the board, and majority shareholder; that he reviews ADW's profit and loss figures, labor costs, balance sheet, and other quarterly financial statements; that he, along with Moffat, set financial goals for ADW; that he attends ADW yearly retreats; that he recently developed a software application for ADW with input from Plaintiffs and other PCs; that he has the authority to hire and fire even though he has not exercised it; and that he has the authority to control work schedules and conditions of employment at ADW, though he has not exercised it. (*See* ECF No. 32.) However, Bryant does not qualify as an "employer" under the FLSA simply because he owns a majority share of ADW. The record evidence shows that Bryant did not exercise meaningful operational control over ADW or supervise Plaintiffs in a manner that would render him an "employer" under the FLSA. Accordingly, Bryant is entitled to summary judgment and his motion (ECF No. 27) is granted.

## C. Defendants' and Plaintiffs' Motions for Summary Judgment

### 1. Administrative Capacity Exemption

The FLSA requires employers to pay employees at least one and a half times their hourly rate for every hour worked beyond forty hours in a workweek. 29 U.S.C. § 207(a)(1). However, an employee who works in a bona fide administrative position is exempt from the overtime pay provisions of the FLSA. 29 U.S.C. § 213(a)(1). Defendants classified Plaintiffs and other PCs as exempt employees under the FLSA and did not pay them overtime. (ECF No. 29-1 at 1–2.) The gravamen of the parties' motions for summary judgment centers on the question of whether PCs at ADW were properly classified as working in an "administrative capacity," and therefore exempt from overtime pay. *See* 29 U.S.C. § 207(a)(1). Exempt status is an affirmative defense, and the employer bears the burden of proving, by clear and convincing evidence, that the employees' jobs qualify for an exemption. *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688, 691 (4th Cir. 2009). "Whether an employee is exempt from the FLSA's overtime requirements is a mixed question of law and fact[.]" *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). The U.S. Supreme Court recently clarified that when making the determination of whether employees' activities are exempt from the FLSA's overtime provisions, the exemption at issue should be given a "fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (citation omitted).

As an initial matter, Plaintiffs argue that Defendants waived the affirmative defense that Plaintiffs were employed in an administrative capacity because they failed to explicitly assert this defense in their answer and/or to raise it in their opposition to Plaintiff's Motion for Conditional Certification. (ECF No. 33 at 9–10.) This argument is unavailing. Defendants pleaded in their answer that Plaintiffs were exempt employees under the FLSA and were not entitled to overtime. (ECF No. 7 at 5.) This expression of their defense was sufficient to give Plaintiffs fair notice of Defendants' theory of the case, and the Court finds that the defense was not waived.

An employee qualifies as being "employed in a bona fide administrative capacity" under the FLSA if: (1) the employee is compensated at a salary of not less than $455 per week;[1] (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The elements of this exemption are conjunctive; all three must apply to an employee before that employee is exempt from the overtime provisions of the FLSA.

It is undisputed that Plaintiffs were paid at least $455 per week and that they performed non-manual office work. (*See* ECF No. 33 at 10.) However, Plaintiffs contend that their primary duty was not "directly related to the management or general business operations" of ADW. *See* 29 C.F.R. § 541.200(a). An employee meets the "directly related" test when she "must perform work directly related to assisting with the *running or servicing of the business*, as distinguished, for example, from working on a manufacturing

---

[1] This salary threshold was subsequently changed to $684 per week. However, the parties agree that $455 per week is the relevant figure here.

production line or selling a product in a retail or service establishment." 29 C.F.R. §

541.201(a) (emphasis added).

> Work directly related to management or general business operations
> includes, but is not limited to, work in functional areas such as tax; finance;
> accounting; budgeting; auditing; insurance; quality control; purchasing;
> procurement; advertising; marketing; research; safety and health;
> personnel management; human resources; employee benefits; labor
> relations; public relations, government relations; computer network, internet
> and database administration; legal and regulatory compliance; and similar
> activities.

29 C.F.R. § 541.201(b). Moreover,

> [a]n employee may qualify for the administrative exemption if the
> employee's primary duty is the performance of work directly related to the
> management or general business operations of the employer's customers.
> Thus, for example, employees acting as advisers or consultants to their
> employer's clients or customers (as tax experts or financial consultants, for
> example) may be exempt.

29 C.F.R. § 541.201(c). The Court agrees with Plaintiffs and finds that PCs did not

perform work directly related to the management or general business operations of ADW,

but rather performed the day-to-day carrying out of ADW's business—namely, brokering

video shoots between video production crews and clients. (*See* Moffatt Dep. 5:12–15;

ECF No. 33-2 ("You have clients on one side. You have crews on another. [ADW is] in

the middle, as a broker. And we mark up to the client and we mark down to the crew.").)

The work that PCs performed at ADW did not directly relate to any of the

administrative categories or functional areas listed in 29 C.F.R. § 541.201(b). Nor can the

PCs' work be fairly described as "running or servicing" ADW's business. *See* 29 C.F.R. §

541.201(a). The Fourth Circuit has repeatedly held that supervisory work or direct

contribution to a business's policies and strategies is generally required to fulfill the

"management or general business operations" element. *See e.g.*, *Calderon v. GEICO*

*General Ins. Co.*, 809 F.3d 111, 124 (4th Cir. 2015); *Desmond*, 564 F.3d at 694. There is no evidence that PCs supervised any ADW employees or made any contribution to the business's policies and strategies. The undisputed evidence shows that PCs are at the bottom of ADW's organizational chart, only over interns, and that ADW did not usually employ interns.

Section 541.201(a) of Title 29 of the Code of Federal Regulations has been described as establishing an "administrative-production dichotomy" for analysis in determining whether an employee's duties qualify for the administrative capacity exemption. ADW is a service-industry business and does not readily fit the paradigm of a factory setting, where there is a relatively clear delineation between office administrators/ managers and production line workers. Nevertheless, the Fourth Circuit has stated, "Although the administrative-production dichotomy is an imperfect analytical tool in a service-oriented employment context, it is still a useful construct." *Desmond*, 564 F.3d at 694. The leading Fourth Circuit case applying the "administrative-production dichotomy" is *Desmond v. PNGI Charles Town Gaming, L.L.C.*, in which the FLSA plaintiffs were horse racing officials at a business that "produced" live horse races. *Id.* at 689–90. The plaintiffs in *Desmond* fulfilled several roles related to the horse races, including: observing and examining the horses, the jockeys, the trainers or grooms, the paperwork for the horses, the order of finish for the race, and the paperwork associated with any subsequent claims. *Id.* at 694. The Fourth Circuit found that the plaintiffs were not employed in an administrative capacity, stating:

> Racing Officials have no supervisory responsibility and do not develop, review, evaluate, or recommend Charles Town Gaming's business policies or strategies with regard to the horse races. Simply put, the Former Employees' work did not entail the administration of—the "running or

> servicing of"—Charles Town Gaming's business of staging live horse races. The Former Employees were not part of "the management" of Charles Town Gaming and did not run or service the "general business operations." While serving as a Placing Judge, Paddock Judge, or performing similar duties is important to the operation of the racing business of Charles Town Gaming, those positions are unrelated to management or the general business functions of the company.

*Id.* Instead, the court found that the plaintiffs' work "consisted of tasks somewhat similar to those performed 'on a manufacturing production line or selling a product in a retail or service establishment.'" *Id.* (quoting 29 C.F.R. § 541.201(a)).

In the instant case, there is no genuine dispute that ADW's business is to book video crews for clients seeking to conduct video shoots. The PCs primary duty was to provide the very service that AD offered to customers in order to generate revenue. Moffatt agreed to as much in his deposition:

> Q. You would agree that the primary duty of a production coordinator is to book shoots?
> A. Yes.
> Q. And if you -- what other ways would you generate revenue, other than booking shoots?
> A. We wouldn't. That is our core business.

(Moffatt Dep. 35:15–20.) Thus, "[t]he position of [PC] consists of 'the day-to-day carrying out of [ADW's] affairs' to the public, a production-side role." *Desmond*, 564 F.3d at 694 (citing *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)).

Because the PCs' duties fail the "directly related" test for administrative capacity, it would be extraneous for the Court to consider whether those duties entail the exercise of discretion and independent judgment with respect to matters of significance. *See McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 849 (9th Cir. 2017) ([W]e need not reach [plaintiffs' argument that they do not exercise discretion and independent judgment with respect to matters of significance] because the test to qualify for the

administrative exemption under FLSA is conjunctive, not disjunctive . . . ." (citation omitted)). In summary, there is no genuine dispute of fact as to how PCs spent their working time, and the Court finds as a matter of law that PCs primary duties did not exclude them from the overtime benefits of the FLSA. *See Icicle Seafoods*, 475 U.S. at 714. Accordingly, Plaintiffs' Motion for Summary Judgment is granted to the extent that it seeks a ruling that PCs were not employed in an exempt "administrative capacity;" Defendants' Motion for Summary Judgment on this issue is denied.

### 2. Retaliation Claim

In their Motion for Summary Judgment, Defendants seek summary judgment on Plaintiff's second cause of action for retaliation. (ECF No. 29-1 at 12–14.) The antiretaliation provision of the FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3).

> A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) [s]he engaged in an activity protected by the FLSA; (2) [s]he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action.

*Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008) (citations omitted).

Defendants contend that Plaintiff Cockman's "complaint" about her salary and her frustration with the on-call requirement for PCs was nothing more than her blowing off steam to co-workers and a consultant about her working conditions, and that such expressions of frustration fall short of the formality required to put Defendants on notice

21

that she was asserting her rights under the FLSA. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) ("[T]he phrase 'filed any complaint' [in § 215(a)(3)] contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns."). Defendants further contend that Plaintiff has not produced evidence to show they had clear knowledge that Plaintiff engaged in activity protected by the FLSA in proximity to the time of her termination. (ECF No. 29-1 at 15.) Finally, Defendants argue that even if Plaintiff's informal complaints about her working conditions amount to protected activity, and even if Defendants had knowledge of that protected activity, Plaintiff was terminated for cause due to her failure on three occasions to perform duties as a PC without any justifiable excuse. (*Id.*)

At this stage, the Court must view the evidence in the light most favorable to Plaintiff Cockman and draw all reasonable inferences in her favor. *Tolan v. Cotton*, 572 U.S. 650, 657, 660 (2014). Under this standard the Court finds there are material questions of fact that prevent the entry of summary judgment on the retaliation claim. Cockman testified that she complained about her compensation in the context of being overburdened by her work responsibilities, including uncompensated overtime hours, to Moffatt as well as to managers Erin, Courtney, and Robin. (Cockman Dep. 122:6–124:10, ECF No. 36-2.) Additionally, Cockman testified that she complained to Becca Finley about feeling very overworked and told Ms. Finely she thought it was unfair that the PCs were not being paid for the hours they were working on call, whereas freelance employees of the company were being paid overtime. (*Id.* 216:1–217:9.) Cockman understood Ms.

22

Finley to be a consultant hired by ADW to meet with employees and ask them questions about their job. (*Id.*) Cockman testified she was terminated between one and two months after this conversation with Ms. Finley. (*Id.*) The Court finds that Cockman has presented sufficient evidence from which a reasonable jury could conclude that she engaged in activity protected by the FLSA, that Defendants had knowledge of that protected activity, and that there was a causal connection between the protected activity and her termination. Accordingly, there is a genuine dispute on the retaliation claim and Defendants' Motion for Summary Judgment on that claim is denied.

### 3. Liquidated Damages

In their Motion for Summary Judgment, Plaintiffs seek an award of liquidated damages. (ECF No. 33 at 17–19.) Plaintiffs contend that the FLSA envisions the award of liquidated damages in an amount equal to the actual damages as the norm for violations of the Act. *See* 29 U.S.C. § 216(b). However, they acknowledge that a district court may, in its discretion, refuse to award liquidated damages if the employer shows to the court's satisfaction that the act or omission giving rise to the plaintiff's action was in good faith and that the employer had reasonable grounds for believing the act or omission was not a violation of the FLSA. *See* 29 U.S.C. § 260. Plaintiffs argue that Defendants cannot claim they were acting in good faith when they knew the PCs were working overtime and not being paid, when they made on-call hours a job requirement but left that fact out of the employment contract, and when Moffatt made efforts to comply with FLSA overtime requirements for GTT employees but not for ADW employees. (ECF No. 33 at 19.)

The Fourth Circuit has stated that the provision in the FLSA which permits a district

court, as a matter of discretion, to refuse to award liquidated damages upon an employer's showing of good faith and reasonable grounds for its conduct is designed to "protect[] employers who violate the statute but who had reasonable grounds for thinking the law was other than it turned out to be." *Calderon*, 809 F.3d at 132 (internal quotation marks and citation omitted). "'[G]ood faith' and 'reasonable grounds' are both measured objectively, *see* 29 C.F.R. § 790.22(c), and establishing either element is sufficient to satisfy the statute." *Id.* (citing *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997) (emphasis added). In *Calderon*, the court affirmed the district court's decision not to award liquidated damages where the employer reviewed the employee classification to determine whether the administrative exemption continued to apply, and where the issue of classification was close and complex. *Id.* at 132–33. The law does not require an employer to demonstrate that he sought an opinion from the Department of Labor ("DOL") or consulted with an attorney to establish that the classification of employees was done in good faith. *Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 150 (D. Md. 2019). On the other hand, an award of liquidated damages is appropriate where the employer stays "blissfully ignorant of FLSA requirements" and maintains an "'ostrichlike attitude of self-delusion'" regarding the Act. *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984) (quoting *Mitchell v. Hausman*, 261 F.2d 778, 780 (5th Cir. 1958)).

Moffatt testified that he checked the DOL website about the overtime exemption issue several times over several years, including circa 2016 when changes were made to the FLSA at the end of the Obama Administration and at the beginning of 2020. (Moffatt Dep. 97:24–98:22, ECF No. 33-2.) Moffatt indicated that, in his estimation, the DOL website was very informative and clearly spelled out when overtime exemptions applied.

24

(*Id.*) After reviewing the DOL website, Moffatt determined that ADW's pay policies toward PCs were compliant with the FLSA, and Moffatt could not recall anyone having complained that the pay policies were not FLSA compliant. (*See* Moffatt Dep. 146:7–147:9, ECF No. 42-2.)

The Court finds that Defendants have raised a genuine question of material fact as to whether Moffatt's decision not to pay the PCs overtime was made in good faith. The determination regarding whether PCs qualified as exempt employees was, under the circumstances, somewhat of a close call, and more complicated than the typical "administrative-production dichotomy" would suggest. *See Desmond*, 564 F.3d at 694 (noting this analytical framework is imperfect in the service industry context). Moreover, Plaintiffs' comparison between the overtime pay practices of ADW toward PCs and the practices of GTT toward cameramen, weighs toward a finding that Moffatt's classification of PCs as exempt was a reasoned, albeit erroneous, decision, rather than a finding that Moffatt remained blissfully ignorant of the FLSA's requirements. Ultimately, the Court reserves ruling on the question of liquidated damages, preferring to receive further evidence regarding Moffatt's then contemporaneous understanding of ADW's FLSA compliance with respect to overtime pay for PCs. Because genuine questions remain regarding liquidated damages, Plaintiffs' Motion for Summary Judgment on this issue is denied.

### 4. Reckless Indifference and the Statue of Limitations

Plaintiffs further seek a judicial finding that Defendants acted with reckless indifference to the FLSA's overtime pay requirements and a corresponding extension of the statute of limitations. (*See* ECF No. 33 at 19–20.) A willful violation of the FLSA

extends the statute of limitations to three years. 29 U.S.C. § 255(a). An FLSA plaintiff bears the burden of proving by substantial evidence that the employer knew it was in violation of the FLSA or acted in reckless disregard of its obligations under the Act. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988). "The FLSA provides two potential limitations periods." *Desmond*, 630 F.3d at 357. "For non-willful FLSA violations, a two-year statute of limitations applies." *Id.* (citing 29 U.S.C. § 255(a).) "When the violation is willful, a three-year statute of limitations applies." *Id.* For purposes of the FLSA's statute of limitations, willfulness means the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [Act]." *McLaughlin*, 486 U.S. at 133. "'[W]illful' is considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional[,]'" and denotes conduct "that is not merely negligent." *Id.* "[A]n employer's conduct is considered to be in reckless disregard of the FLSA if the employer should have inquired further into whether its conduct was in compliance with the FLSA and failed to make such inquiry." *De Luna-Guerrero v. N. Carolina Grower's Ass'n, Inc.*, 370 F. Supp. 2d 386, 389–90 (E.D.N.C. 2005) (citing 29 C.F.R. § 578.3(c)(2)).

As discussed in relation to the liquidated damages issue, the evidence reveals that Moffatt *did* inquire into the proper classification of PCs for purposes of the FLSA's overtime pay requirements. The parties contest whether that inquiry was sufficient. However, Plaintiffs have not shown that there is no genuine dispute as to Defendants' alleged reckless indifference regarding misclassification of PCs as exempt. Accordingly, Plaintiff's Motion for Summary Judgment on this issue and request for extension of the statute of limitations is denied.

**D. Defendants' Motion to Strike and/or Deny Plaintiffs' Motion for Partial Summary Judgment and/or Award Sanctions to the Defendants**

Shortly after Plaintiffs filed their Motion for Summary Judgment, Defendants moved to strike that filing, arguing that it was untimely. (ECF No. 34.) The Court entered a First Amended Scheduling Order on July 9, 2020. (ECF No. 22.) That Order instructed that dispositive motions were due on August 13, 2020. (*Id.* ¶ 10.) On August 10, 2020, Plaintiffs filed a Consent Motion to extend the deadline to August 20, 2020 (ECF No. 28), which motion was granted by the Court the following day (ECF No. 30). Plaintiffs filed their Motion for Summary Judgment at approximately 12:45 a.m. on August 21, 2020 (Not. of Electronic Filing, ECF No. 33), 45 minutes after the applicable deadline.

Plaintiffs' counsel has explained that she tested positive for COVID-19 on June 22, 2020 and was unable to return to her office until July 8, 2020 because of the necessity to quarantine and recover. (Mullaney Decl., ECF No. 21-1.) Counsel has further explained that when she returned to work she was inundated with deadlines and had to reschedule mediations, depositions, and briefing deadlines due to her illness. (*See* ECF No. 41 at 2.) In light of these circumstances, the Court finds that counsel's 45-minute delay in filing Plaintiffs' Motion for Summary Judgment is excusable and does not justify the drastic remedy of striking the Motion. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) ("Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." (internal citation and quotation marks omitted)). Moreover, Defendants have not demonstrated any unfair prejudice that could be ascribed to the 45-minute delay. Accordingly, Defendants' Motion to Strike and/or Deny Plaintiffs' Motion for Partial Summary Judgment and/or Award Sanctions to the Defendants is

denied.

## CONCLUSION

In accordance with the findings above, it is hereby ordered that: Plaintiff's Motion for Conditional Class Certification (ECF No. 18) is GRANTED; Defendants' Motion for Relief from Mediation (ECF No. 24) is DENIED as moot,[2] and the parties are hereby instructed to schedule and complete mediation within 60 days of the entry of this Order; Defendant's Motion for Summary Judgment as to Patrick Bryant (ECF No. 27) is GRANTED; Defendants' Motion for Summary Judgment (ECF No. 29) is DENIED; Plaintiffs' Motion for Summary Judgment (ECF No. 33) is GRANTED in part and DENIED in part; and Defendants' Motion to Strike and/or Deny Plaintiffs' Motion for Partial Summary Judgment and/or Award Sanctions to the Defendants (ECF No. 34) is DENIED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

May 3, 2021
Charleston, South Carolina

---

[2] Defendants' basis for the Motion for Relief from Mediation was their belief that Plaintiffs had no valid claim for unpaid overtime because Plaintiffs were "exempt" employees, and mediation prior to resolution of the parties' disagreement over the classification of PCs would be fruitless. (*See* ECF No. 24 at 1–2.) The Court's determination that PCs were not exempt from the FLSA's overtime pay requirements renders the Motion moot.